1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THOMPSON COBURN LLP**
**RICHARD G. REINIS, CSB 45811**
**rreinis@thompsoncoburn.com**
**JEFFREY N. BROWN, CSB 105520**
**jbrown@thompsoncoburn.com**
**2029 Century Park East, 19th Floor**
**Los Angeles, California 90067**
**Tel: 310.282.2500 / Fax: 310.282.2501**

Proposed Attorneys for Debtor and Debtor in Possession
SFC Financial Corporation

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In Re: | Case No. 2:18-bk-18021 |
| SULTAN FINANCIAL CORPORATION, a California corporation | Chapter 11 |
| Debtor. | **OMNIBUS DECLARATION OF RANDALL C. SULTAN IN SUPPORT OF DEBTOR'S "FIRST-DAY" MOTIONS** |
| Tax ID: 95-4028025 | Date: July 17, 2018<br>Time 10: 00 a.m.<br>Place: Courtroom 1568<br>Roybal Federal Building<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

1

I, Randall C. Sultan, declare:

## PRELIMINARY STATEMENTS

1.      I am over twenty-one years of age and otherwise competent to testify about the matters set forth herein.

2.      I am the Chief Executive Officer of Sultan Financial Corporation ("SFC" or the "Debtor"), the above-referenced debtor and debtor in possession in this chapter 11 case. Except as otherwise indicated, all facts set forth in the declaration (the "Declaration") are based upon my personal knowledge, my discussions with other members of the Debtor's management team, the Debtor's employees and the Debtor's advisors, my review of relevant documents and information concerning the Debtor's operations and financial affairs.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

3.      I am generally familiar with the Debtor's day-to-day operations, business affairs, books and records, as well as the Debtor's restructuring efforts.  I submit this Declaration to assist the Court and the parties in interest in understanding, among other things, the Debtor's operations, its corporate structure, and circumstances that led to the commencement of this chapter 11 case and in support of the Debtor's petition for relief under chapter 11 of title of the United States Code (the "Bankruptcy Code") filed on July 13, 2018 (the "Petition Date") and the relief the Debtor request from the Court pursuant to the motions and applications described in this Declaration (collectively, the "First Day Motions").

## BACKGROUND INFORMATION ON THE DEBTOR AND
## THE RENT-TO-OWN INDUSTRY

4.      SFC was incorporated in the State of California on January 27, 1986.  The Randall and Patricia Sultan Family Revocable Trust dated December 5, 1999, as amended (the "Sultan Family Trust") owns all of the stock in SFC.  I am the sole member of SFC's board of directors.

5.       As indicated above, I am the Chief Executive Officer of SFC.  Other members of senior management and their titles are as follows:

1

| Name | Title |
|------|-------|
| Zackary Vandenberg | President |
| Gregg Sultan (my son) | Vice President and General Counsel |

6. Since 1997. SFC has developed and operated Aaron's Sales & Lease stores. SFC presently operates sixteen (16) Aaron's stores (the "Stores") throughout Southern California. These stores are operated as franchises of Aaron's, Inc., a publicly traded corporation based in Atlanta ("Aaron's").

7. The Debtor is in the so-called rent-to-own industry ("RTO") industry, which services an often neglected market segment. RTO stores rent household durable goods such as appliances, consumer electronics, big screen televisions and furniture to customers on a weekly or monthly basis. Ownership of the merchandise automatically passes to the customer after a prescribed number of continuous rental payments and customers have the option to purchase the merchandise for a set cash amount at any time. Despite signing an agreement to make payments lasting a certain number of months, customers are under no obligation to rent the item for the entire period. In fact, the average rental period lasts only four months. Approximately 35% of all contracts go to term, when the merchandise is rented continuously for the entire agreement period and ownership passes to the customer or the customer pays out the agreement early.

8. The Debtor's gross revenues and net income for the past three years are as follows:

| Year | Gross Revenues | Net Income |
|------|----------------|------------|
| 2015 | $31,227,230 | $-698,620 |
| 2016 | $29,849,114 | $-376,757 |
| 2017 | $24,867,156 | $-441,201 |

9. The Debtor has inventory of furniture and other products available for rent/own available at each of its Stores. As of July 2, 2018, the aggregate value of this inventory (at cost) for all Stores was $1,255,700.

- 2 -

10.     The Debtor currently has approximately 13,040 customers with active contracts. These 13,040 plus customers account for approximately 20,500 total contracts.  The aggregate dollar value of the remaining payments due under these contracts is approximately $26,631,000. Historically, given pre-payments, defaults and other recurring events, SFC collects approximately 55% of the outstanding lease value, which yields an estimated value for the outstanding contracts of $14,647,000.

11.     SFC typically writes about 1,700 new contracts per month.

**DEBTOR'S DEBT AND CAPITAL STRUCTURE**

12.     SFC's primary secured creditor is ZB, N.A., successor by merger to California Bank & Trust ("CBT" or the "Lender").[1] In January 4, 2012, the Debtor entered into a Commercial Loan Agreement (as amended, the "CLA") with CBT, which provided for a revolving line of credit loan in favor of the Debtor ("Line of Credit") and terms loans made by CBT to SFC (the "Term Loans"). The CLA has been amended or modified approximately 15 times since it was originally executed.

13.     To secure the payments of all amounts due under the Line of Credit and the Term Loans (collectively, the "CBT Loans"), together with the performance of all other obligations owing to the Lender, the Debtor delivered to the CBT  a Security Agreement dated as of January 4, 2012 wherein the Debtor granted to the Lender a lien and security interest in all of its assets, whether real or personal, tangible or intangible, now existing or hereinafter acquired, including but not limited to all (i) Chattel Paper (including all amendment, replacements, amendments and restatements and substitutions thereof), (ii) Goods, Inventory, Equipment and other items of personal property held by the Debtor for any reasons (including but not limited to repossession or return) or leased by the Debtor to third parties and all existing and future accessions, accessories and attachments thereto and replacements thereof, (iii) cash, deposit accounts and Accounts, (iv) contracts, agreements (including but not limited to purchase agreements), warranty rights,

---

[1] On January 1, 2016, ZB, N.A. became the successor by merger to CBT.  ZB, N.A. does business under the name of California Bank & Trust.  To avoid any confusion, the declarant uses the term "CBT" herein, which shall be deemed to refer to the Lender, both before and after the January 1, 2016 merger.

Instruments and Documents of Title related to any of the foregoing, (v) trademarks, together with the registrations and right to all renewals thereof, and the good will of the business symbolized by the trademarks, (vi) patents and copyrights, (vii) proprietary computer programs and all intellectual property rights therein and all other proprietary information including, but not limited to, trade secrets, (viii) General Intangibles, (ix) existing and future books and records relating to any of the foregoing items, and (x) products and Proceeds, cash and non-cash (including, but not limited to, insurance proceeds, rents, issues, income and profits) of any of the foregoing (the "First Lien Collateral").

14.    CBT perfected its interest in the First Lien Collateral by filing UCC-1 financing statement documents with the California Secretary of State's Office as set forth below:

| Filing Type | Date | File Number |
|---|---|---|
| Original | 1/27/2012 | 12-7299272990 |
| Continuation | 8/2/2016 | 16-75393368 |
| Amendment | 3/17/2017 | 17-75760130 |

15.    As of July 13, 2018, the balance due to the Lender is $15,556,285.54 (the "CBT Indebtedness") as follows:

| Loan No. | Principal Due | Interest | Total |
|---|---|---|---|
| Loan XXX9001 | $13,286,461.63 | $107,633.50 | $13,394,095.13 |
| Loan XXX9004 | $426,982.26 | $789.78 | $427,772.04 |
| Term XXX7001 | $1,731,230.37 | $3,188.00 | $1,734,418.37 |

16.    As a result of the foregoing, CBT holds a valid, perfected first priority lien and security interest in the First Lien Collateral to secure repayment of the CBT Indebtedness.

17.    The CBT Indebtedness is guaranteed by me personally and in my capacity as a trustee of the Sultan Family Trust.  My spouse did not personally guarantee the CBT Indebtedness, but she is a co-trustee of the SFC Family Trust and did sign a guaranty in that capacity.

18.    As described below, SFC has entered into a separate Franchise Agreement with Aaron's for each Store.  The form Franchise Agreement contains language granting Aaron's a security interest in certain of SFC's assets.  However, based on a recent search of the California Secretary of State's records, Aaron's did not file a UCC-1 financing statement, and its claims are therefore unsecured.

19.    SFC owns no real estate.  However, it leases its corporate headquarters and its sixteen Stores (the "Real Estate Leases").  Six (6) of the Real Estate Leases are with entities in which I have an ownership interest.  The other eleven (11) Real Estate Leases are with totally unrelated parties.  SFC is current on all monthly rent obligations due under the Real Estate Leases through July 1, 2018.  Either the Sultan Family Trust or I have personally guaranteed five (5) of the eleven (11) Real Estate Leases with unrelated parties.

20.    SFC also leases thirty (30) vehicles ("Vehicle Leases") that are used at the Stores for customer deliveries and returns.  The Vehicle Leases are current as of the Petition Date.

21.    SFC also owes various amounts to Aaron's, its franchisor.  First, as of the Petition Date, the Debtor owes Aaron's $1,457,497 for inventory purchases.  Second, the Debtor executed a promissory note in favor of Aaron's in 2016.  As of the Petition Date, the amount due under the Aaron's Note (defined below) is approximately $3,214,000.  As stated above, these sums are unsecured.  Finally, as described in more detail below, SFC also leases certain equipment and signage from Aaron's.  As discussed in more detail below, because of its dispute with Aarons, SFC asserts that all amounts owed to Aaron's are subject to offset, reduction, avoidance, setoff, recoupment, etc.

22.    In addition to the foregoing claims, SFC has general unsecured non-insider trade claims totaling approximately $282,509.

23.     From time to time, I have loaned my own personal funds to SFC for general corporate purposes.  These loans were evidenced by promissory notes.  On January 1, 2017, an addendum was executed that amended all of the notes so that they mature on January 1, 2019 (these notes, as amended, shall collectively be referred to as the "Shareholder Notes").  The aggregate principal amount due under the Shareholder Notes is $950,000.  The Shareholder Notes are unsecured.  I have received no payments of either interest or principal on the Shareholder Notes for more than three (3) years. The Shareholder Notes have been carried on SFC's books and reported to CBT and others on SFC's financial statements.

24.     SFC is substantially current on all of its pre-petition obligations owing to taxing authorities.  SFC owes accrued employment-related tax obligations for the current payroll period. SFC also owes sales taxes for the current period.  As described in more detail below, SFC will seek approval to pay the priority employment-related and sales tax obligations as part of the first day relief in this case.

25.     To recap,  the pre-petition claims against SFC can be summarized as follows:

| Claimant | Amount |
|---|---|
| CBT (secured by a blanket lien) | $15,556,286 |
| Aaron's trade debt (unsecured) | $1,457,497 |
| Aaron's Note (unsecured) | $3,214,000 |
| Shareholder Note (unsecured) | $950,000 |
| Misc. non-insider  trade claims (unsecured) | $282,509 |

**RELATIONSHIP WITH AARON'S**

26.     Aaron's is a publicly traded corporation based in Atlanta.  According to its website, Aaron's has approximately 1,719 Stores in the United States and Canada.  Some of the stores are owned and operated by Aaron's, while others are franchised. SFC is Aaron's largest franchisee in the State of California.

27.    SFC and Aaron's executed a separate Franchise Agreement for each of the sixteen Stores that are currently open.  The Franchise Agreements are substantially identical in form and substance.  In general, the economic terms of the Franchise Agreements are as follows:

(a)    The royalty due to Aaron's under the original Franchise Agreement is 6% of gross sales. However, pursuant to the Aaron's Settlement Agreement (defined below), Aaron's agreed to a moratorium on royalty payments until August 1, 2018 and to reduced royalty payments of 5% of gross sale from August 1, 2018 through August 1, 2020.

(b)    Aaron's reserves the right to impose media fees on Sultan under the Franchise Agreements, but no such fees have been assessed to-date.

28.    As mentioned in the previous section, Aaron's and SFC also entered into various other transactions in addition to the Franchise Agreements.

(a)    Equipment Leases.  SFC leases certain computer equipment and software from Aarons pursuant to separate leases (the "Aaron's Equipment Leases") for each of the Stores.  The total monthly rent payment due to Aaron's for Aaron's Equipment Leases is approximately $7,527.  The rent payments for the Aaron's Equipment Leases are current;

(b)    Signage.  Aaron's and SFC also entered into Exterior Sign Lease Agreements ("Sign Agreements") for each of the Stores.  The aggregate monthly rent payments due to Aaron's under the Sign Agreements is $557, and the payments are current;

(c)    Inventory.  SFC has historically purchased the bulk of its in-Store inventory from Aaron's on trade credit.  As of the Petition Date, SFC owes Aarons' $1,457,497 for inventory purchases.  In June of 2018, Aaron's cut off any further trade credit on the inventory purchases, but it continued to sell inventory to SFC on a cash on delivery basis.

(d)    <u>Settlement Agreement</u>.    SFC and Aaron's mediated a dispute arising from the operation of the franchised business that resulted in a Settlement Agreement dated October 19, 2016.  Incident to that Settlement Agreement, SFC executed a Promissory Note dated August 1, 2016 in the principal amount of $3,664,118.78 (the "<u>Aaron's Note</u>").  As of the Petition Date, the balance due on the Aaron's Note was approximately $3,214,000. The Aaron's Note is unsecured.

## REASONS FOR CHAPTER 11 FILING

29.    SFC entered into the first Franchise Agreement with Aaron's in 1997.  Each Store is subject to a separate Franchise Agreement that governs the relationship between the parties. Through this system, Aaron's sets retail prices and rents charged to its franchisees' customers, controls communications with franchisee customers, and controls all aspects of invoicing and payment.

30.    SFC is prohibited from reverse engineering this system, and may not permit others to copy, modify, adapt, translate, decompile, disassemble or otherwise attempt to create derivative work from this system, and may not alter it or discover its code.  SFC is required to use the system, but Aaron's disclaims any and all warranties relating to the system.  The lease and software program are referred to in the Franchise Agreements as the "Program," and SFC may not modify, "compile, reverse compile or disassemble all or any part of the Program."

31.    Aaron's installed a new Program for all California franchisees on February 7, 2014. Aaron's implemented the new Program to comply with a settlement reached by Aaron's with the California Attorney General (the "<u>AG</u>") arising from a complaint filed against Aaron's (<u>not</u> against franchisees), Los Angeles Superior Court Case No. BC559774 (the "<u>AG Action</u>").

32.    This new Program, however, made changes that were not required by the AG Action or any other California law. The new Program caused more early payouts by customers and resulted in fewer new contracts.  SFC's profitability began to suffer shortly after implementation of the new Program.

33.     SFC made numerous requests of Aaron's to modify provisions of the new Program to permit the efficient and profitable operations of SFC's business.  Finally, on July 20, 2016, SFC and Aarons participated in a formal mediation of SFC's claims in accordance with Section 11.1(b) of each of the Franchise Agreements.  The mediation resulted in a Settlement Agreement dated October 19, 2016 (the "<u>Settlement Agreement</u>").  Pursuant to Section 2.4 of the Settlement Agreement: "The Parties agree to avoid ongoing disputes of a like nature to the Disputes by consulting <u>in good faith</u> concerning the operations of the business of the Parties, and the Program as defined in Section 7.13(g) of the Franchise Agreements, and its implementation, and amendments, corrections, or additions thereto, proposed by SFC or others, and as otherwise may improve profitability of California franchisees."

34.     In September 2017, after much study of the Program, and pursuant to Section 2.4 of the Settlement Agreement, SFC proposed an innovative modification thereof that would reduce the rising number of early payouts and total payouts of rent-to-own contracts.  Once implemented, this proposed change in the Program would produce a form of consumer agreement that would generate on-going profitable transactions.  In October of 2017, Aaron's confirmed that the proposed correction of the Program would likely achieve the desired result and not violate applicable law.

35.     Despite SFC's repeated efforts to cause Aaron's to comply with its agreement to negotiate on the terms of the Program (as it promised to do in the Settlement Agreement), Aaron's has refused to engage in meaningful and good faith negotiations for the much needed modifications to the Program. In the meantime, SFC's declining revenue and declining profitability caused further stress in SFC's relationship with CBT, its secured creditor.  SFC's loans with CBT matured on June 15, 2018.

36.     The Debtor intends to file an adversary proceeding against Aaron's alleging that it has breached the terms of the Settlement Agreement, thereby damaging the Debtor (the "<u>Adversary Proceeding</u>").  In my view, there are three principal avenues to resolve this situation, including the Adversary Proceeding: (a) a revision of the Program that permits SFC (and other California

- 9 -

franchisees) to operate profitably; (b) a sale of the Stores to Aaron's; or (c) a sale of the Stores to another RTO retailer that provides a Program that provides a more profitable result consistent with California law. SFC filed the instant Chapter 11 case to facilitate those discussions and to implement a solution.

## **FACTS IN SUPPORT OF "FIRST DAY" MOTIONS**

**Debtor's Emergency Motion For Order Authorizing Payment And/Or Honoring Of Pre-Petition Employee Compensation, Benefits, Reimbursements, Withholding Taxes, Accrued Vacation, And Related Employee Claims (the "Employee Motion")**

37.    As of the Petition Date, the Debtor employs approximately 129 full-time employees (the "Employees").    The Debtor employs no one on a part-time basis. Of the 129 full-time Employees, 122 of them work in the Stores and the remaining 7 work in the corporate headquarters. Employees are paid twice per calendar month. The next payroll is scheduled for July 20, 2018 for the pay period July 1 through July 15, 2018. The average amount the Debtor pays to its Employees every two-week pay period is approximately 230,000.    The Debtor uses Paycom to process its payroll.  Payroll and payroll taxes are wired out of the Debtor's payroll bank account at California Bank & Trust ("CBT") one day before each payroll.

38.    The Employees are not insiders of the Debtor, with three exceptions. First,  Gregg Sultan, who is my son,  is the Vice President and General Counsel of the Debtor.  Second, Zackary Vandenberg is the President of SFC.  Third, I am the CEO.  Gregg Sultan, Zackary Vandenberg, and I will each submit a Notice of Setting/Increasing Insider Compensation in accordance with Local Rule 2014-1(a), and none of us will receive any compensation from the Debtor until permitted to do so under the Local Rules.  Finally, Patricia Sultan, who is my spouse and Gregg's mother, is not an employee of the Debtor but before the Petition Date she received a consulting fee of $6,000 annually.  Patricia Sultan will not receive a consulting fee after the Petition Date.  By way of additional disclosure, I own, either directly or indirectly, the real estate on which six of the Stores are located.  Five of the Stores are still operating and the sixth Store is closed.  SFC occupies this real estate pursuant to leases with the owners (the "Insider Leases").  Based on my knowledge

of the real estate market in the areas in which the Stores are located, and the fact that I personally negotiated the leases that are not Insider Leases, I believe that all of the Insider Leases are at or below market for similar properties.  As of the Petition Date, SFC is current on the Insider Leases.

39.    In addition to normal wages and salary, the Debtor has an incentive compensation package.  Store Employees receive $5 in commission compensation for every new agreement written.  Depending on monthly store performance, the $5 commission could be doubled.  Store General Managers receive 4% of a stores quarterly profits.  Employees are also eligible for $100 bonus for scoring a perfect score on monthly phone shops (i.e. a secret shopper calls in and rates the Employees on the call experience). Finally, those Employees in the collections department are eligible for bonuses based on the level of collections on accounts for which they are responsible. The range of these collections bonuses runs from $50 to $1,400 per month per eligible Employee.

40.    The Debtor offers various types of employee benefits.  For example, the Debtor provides medical insurance plans to all full-time Employees through Anthem Blue Cross. Employees are provided a choice of plans with different coverage levels and costs.  SFC pays for life insurance coverage in the amount of $25,000 for Employees and Employees are provided an option to pay for additional coverage for themselves or family members. SFC also offers short term disability insurance and accidental death and dismemberment coverage and accident and critical illness for its Employees through Sun Life.  The employee's portion of the cost of the foregoing coverages are withheld from the employee's paycheck and then paid to the provider.  SFC is current on all payments due to the providers.

41.    SFC Employees accrue paid vacation beginning one year from beginning employment as full time Employees. These sick leave days do not carry over to the next period, and unused hours are not paid out upon termination.  As of July 1, 2018, the amount of accrued but unpaid vacation time for current Employees is $171,234.07.

42.    Employees are also provided a 401(k) retirement plan.  Employee contributions are deducted from the Employee's regular paycheck and SFC then pays the withheld funds to the third party administrator for the 401(k) plan. In addition, SFC will match Employee contributions up to

a 2% maximum to the 401(k) plan for each Employee.  All withheld contributions have been forwarded to the third party administrator and the Debtor is current on its obligations to match.

43.    Certain Employees are entitled to reimbursement of certain expenses incurred during the course of their employment, primarily (i) business meal expenses, (ii) meals and hotel expenses during travel, (iii) mileage reimbursement, (iv) cellphone charges for certain management Employees, and (v) pawn expenses related to the recovery of assets. The total amount of unreimbursed expenses totals approximately $3,000 as of the Petition Date. Employees seeking reimbursement must complete and submit an Expense Report Form to their supervisors on a weekly basis.  The supervisors review the reports and make a recommendation to the corporate headquarters, which then makes the final determination on whether the expense is reimbursable. The Debtor requests that the Court authorize the Debtor to pay any outstanding expense reimbursements as of the Petition Date, and direct CBT to honor any outstanding checks issued to Employees for reimbursement of expenses.

44.    In addition, six persons at the headquarters have company issued charge cards through American Express and/or Capital One Visa:  myself, Gregg Sultan, Patricia Sultan, Zackary Vandenburg, Rick Pommenville, and Charles Ferris.  These company charge cards are used for merchandise purposes and other corporate expenses.  The approximate balance on these charge cards on the Petition Date 16,745. [2]  Also, approximately 35 Employees at SFC's stores have company gas card for use in the ordinary course of business for customer deliveries and pick-ups. The approximate balance on these gas cards as of the Petition Date is $9,703.  The Debtor requests that the Court authorize the Debtor to pay any outstanding amounts due on the company issued cards and the gas fleet credit cards, and to direct CBT to honor any outstanding checks issued to Employees for reimbursement of expenses.

45.    In large part, the Debtor's ongoing operations, the opportunity for the Debtor to maximize the value of the Estate, and the Debtor's ability to meet its obligations is dependent upon

---

[2] The charge card issued to Patricia Sultan before the Petition Date will be canceled.

a stable and productive work force.  Many of the Employees simply cannot afford to miss a pay period or be deprived of benefits they receive in the ordinary course of their employment.  And, to the extent the Debtor is not authorized to make a full payroll payment to them, I believe some of the Employees will suffer extreme personal hardship and in many cases may be unable to pay basic living expenses.  Such a result would obviously devastate employee morale.

46.    The stability of the employee pool is tenuous.  The labor pool is mobile.  At the same time, it could be difficult for the Debtor to find qualified replacement employees with the unfavorable publicity of disrupted pay or benefits.  Even if replacements could be hired, it could take significant time before they could be fully trained and qualified for the jobs, resulting in further disruption and harm to the Business, and the Debtor's ability to maximize the value of the Estate.

47.    I anticipate the Debtor's payroll (including all payroll related taxes and other charges) on July 20, 2018 will be approximately $47,000 a portion of which will relate to the pre-petition period.  The Debtor has sufficient liquidity to make the payroll (including all payroll related obligations) when due.

**Debtor's Emergency Motion for Order: (1) Deeming Utility Companies Adequately Assured of Future Performance; (2) Establishing Procedures for Requests for Additional Assurance; (3) Restraining Utility Companies from Discontinuing or Refusing Service; and (4) Providing for Related Relief (the "Utilities Motion")**

48.    In connection with the operation of its business, the Debtor obtains electricity, natural gas, water/sewage, trash removal/waste, telephone and other similar services from a number of different utility suppliers (collectively, the "Utility Providers")[3].

49.    The Utility Providers are identified to the best of the Debtor's ability in the chart attached as Exhibit 1 to the Utilities Motion. The Debtor is not delinquent in the payment of its obligations to the Utility Providers.  Some of the Utility Providers hold small unsecured pre-petition

---

[3] The Debtor leases all of the locations where it conducts its business. Pursuant to certain of the Debtor's leases, certain utility services may be provided to the Debtor under its leases. In such situations, the Debtor may not have any contractual relationship with the utility provider and the utility provider may not have any claim against the Debtor.

claims against the Debtor because payments were not yet due as of the Petition Date.  I do not anticipate the Debtor will experience any problems in honoring its post-petition utility obligations owing to the Utility Providers.

50.    The utilities are essential to the continued operation of the Stores.  The Debtor's average monthly utility expense, calculated by taking the average of the payments made in the three most recent billing periods before June 2018 is $16,353.48.

51.    Absent the procedures proposed in the Utilities Motion, the Utility Providers may discontinue service, without warning, on the date that is 30 days following the Petition Date, if they claim they have not yet received a "satisfactory" adequate assurance of payment.  Although the Debtor could contest this action, but by the time that they did so, irreparable damage will have already been done.

52.    To avoid this disruption, and subject to court approval,  the Debtor proposes to provide adequate assurance to the Utility Providers by making a deposit equal to 50% of one month's utility service, that is, 50% of the average monthly payment identified for each Utility Provider on Exhibit 1 to the Utilities Motion, into a segregated Debtor account, as adequate assurance (the "Adequate Assurance Deposit") upon this Court's entry of the order on the Motion, provided that the Debtor will not make the Adequate Assurance Deposit for the City of Porterville, which already holds a deposit in excess of the amount of the proposed Adequate Assurance Deposit. The Debtor anticipates that the total amount of Adequate Assurance Deposits that the Debtor will make, if the Motion is granted, is approximately $8,151.56.

**Motion for Order Authorizing Debtor to Maintain Bank Accounts and Cash Management Systems and Continue Use of Its Exiting Business Forms (the "Cash Management Motion").**

53.    SFC has twenty (20) bank accounts, as listed on Exhibit 1 attached to the Cash Management Motion.  Each SFC store has its own deposit account at Bank of America into which all cash, checks and credit card receipts associated with that store are deposited each day.  The balances in the various store accounts are then swept each day into a concentration account at Bank

- 14 -

of America, account no. XXXX64525 (the "Concentration Account"). The amount in the Concentration Account is then wire transferred each day into an account at California Bank & Trust ("CBT"), account no. XXXX0111 (the "General Disbursement Account"). The Cash Management Motions seeks court approval to maintain this portion of its historic cash management practices after the Petition Date.

54.    Prior to the Petition Date, each business day, SFC notified CBT of the obligations that SFC intended to pay that day. CBT then swept all amounts in the General Disbursement Account that were not needed to pay the identified obligations and applied the amount it swept to the outstanding line of credit. To the extent that the identified payments were paid via ACH transfers (such as payroll related matters), SFC paid the identified obligations from the General Disbursement Account.  To the extent such payments were made by check, SFC would write a check on the CBT account no. XXXX5841 (the "Controlled Disbursement Account") and sufficient funds were transferred from the General Disbursement Account to the Controlled Disbursement Account so that the checks would clear.  The Cash Management Motion seeks approval to modify this practice after the Petition Date to eliminate the daily sweep from the General Disbursement Account to the line of credit balance.  Instead, the cash collections will remain and accumulate in in the General Disbursement Account until they are paid to creditors in accordance with the budget approved in the cash collateral order.

55.    To facilitate the operations of the Debtor's businesses during the Chapter 11 case, I believe the cash management system described above, containing the modification also described, will be in the best interests of the Debtor, its bankruptcy estate and all creditors.

56.    Additionally, to minimize the expense to the Estate, I believe the Debtor should be permitted to continue to use its correspondence and business forms, including but not limited to, invoices, purchase orders, checks, letterhead, envelopes and other business forms (collectively, the "Business Forms"), substantially in the form existing immediately before the commencement of this Chapter 11 case, without reference to the Debtor's status as a debtor in possession.  In the even

the Debtor has to purchase new Business Forms during the pendency of the Chapter 11 case, such forms will include a legend referring to the Debtor's status as a debtor in possession.

57.    The Debtor Accounts and cash management system is at the heart of the Debtor's ordinary, usual, and essential business practices. Opening new accounts and changing correspondence and business forms would be unnecessary and burdensome to the Estate, as well as expensive and disruptive to the Business. Authorizing (but not directing) the Debtor to continue existing bank accounts, cash management system (with the modifications identified above), and business forms, would advance the opportunity for a successful resolution of this case, preserve a business-as-usual atmosphere, and avoid unnecessary distractions and interruptions that would be caused by a disruption of the Debtor's banking and cash management system. Approval of this Motion is in the best interests of the Debtor, the Estate, and creditors and will help avoid damage to the value of the property of the Estate.

**Motion for Order Authorizing the Debtor to Continue its Insurance Policies and to Pay**

**Prepetition and Postpetition Obligations in Respect Thereto**

**(the "Insurance Motion").**

58.    The Debtor intends to request a hearing on the Insurance Motion in the ordinary course of business, i.e. not on an emergency basis.

59.    The Debtor maintains many policies insuring different types of risks, including property, general liability, umbrella, auto, crime, workers compensation, cyber, employed lawyer, employment practices, directors' and officers' liability and fiduciary liability.  Copies of the declaration pages of the various policies maintained by the Debtor (the "Insurance Policies"), which show the insurance companies issuing the Insurance Policies (the "Insurers") is attached as group Exhibit 1 to the Insurance Motion.

60.    Maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtor's businesses and, moreover, is required under the United States Trustee's Operating Guidelines for chapter 11 cases (the "Operating Guidelines"), the laws of the state of California, and the Debtor's various financial agreements and real estate leases.

Thus, the Insurance Motion seeks authority to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of the Debtor's businesses and to pay on account of the claims filed under the self-insurance plans maintained by the Debtor.

61.    The Debtor incurs approximately $472,554 in annual premiums relating to the Insurance Policies, including base premiums, broker fees and finance costs.

62.    The Debtor is current and, in some cases even, prepaid on all of its Insurance Policy payments.  To the extent there are any outstanding prepetition amounts on account of the Insurance Policies, the Debtor requests that the Court authorize, but not direct, the Debtor to pay any such outstanding amounts in its sole discretion.  I believe that payment of the Prepetition Insurance Obligations (defined below) is necessary to ensure continued coverage under the Insurance Policies and to maintain good relationships with the Insurers.  The Debtor's maintenance of its relationships with the Insurers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

63.    In the ordinary course of business, the Debtor employs an insurance broker, Pritchard & Jerden, Inc. (the "Broker"), to assist the Debtor with the procurement and negotiation of many of the Debtor's Insurance Policies.  For broker-related services, the Debtor pays in the ordinary course of business either flat fees or commission (the "Broker Fees").  The Broker is essential to the Debtor's ability to secure insurance coverage, as they obtain and manage its Insurance Policies in a reasonable and prudent manner and enable the Debtor to realize considerable savings in the procurement of the Insurance Policies.  Most importantly, however, the Debtor does not have access to certain key markets unless represented by the Broker.  The Debtor seeks this Court's authority to continue to employ the Broker and pay necessary Broker Fees in connection with the procurement of the Insurance Policies.

64.    The Debtor uses two premium finance companies to finance the cost of the Insurance Policies: Insurance Payment Company ("IPC") and Artex Risk Solutions ("Artex") (IPC and Artex are collectively referred to as the "Premium Financiers").  Information regarding the

amounts financed and the terms of the financing (the "Premium Financing Obligations") is attached as Exhibit 2 to the Insurance Motion.

65.    The obligations under the Premium Financing Obligations are secured by (i) all unearned premiums that may become payable under the Insurance Policies and (ii) any loss payments that reduce the unearned premiums under each of the Insurance Policies that are covered by the Premium Financing Obligations (subject to any mortgagee or loss payee interest).  Under the Premium Financing Obligations, the Premium Financiers are appointed as attorney in fact with authority to, among other things, cancel the Insurance Policies upon default under the Premium Financing Obligations.

66.    In light of the importance of maintaining insurance coverage with respect to business activities, I believe that it is in the best interests of its estate and creditors for this Court to authorize the Debtor to honor its obligations under the Premium Financing Obligations.  Any other alternative would likely require considerable cash expenditures and could be detrimental to the Debtor's chapter 11 reorganization and/or sale efforts.

**Debtor's Emergency Motion For Interim And Final Orders: (1) Authorizing Debtor Use Of Cash Collateral Pursuant To 11 U.S.C. § 363; (2) Granting Adequate Protection To Prepetition Senior Lender Pursuant To 11 U.S.C. §§ 361, 362, And 363, (3) Scheduling Final Hearing Pursuant To Bankruptcy Rule 4001; And (4) Granting Related Relief (the "Cash Collateral Motion")**

67.    The Debtor has developed a cash budget of anticipated collections and payments covering the 13 weeks following the Petition Date ("13 Week Cash Budget"), a copy of which is attached to the Cash Collateral Motion. As described in more detail above, CBT holds a valid, perfected first priority lien and security interest in substantially all of the Debtor's assets and properties, including assets constituting "cash collateral" under Section 363(a) of the Bankruptcy Code (the "Cash Collateral").

68.    The Debtor has an immediate and critical need to use Cash Collateral in with CBT holds an interest to, among other things, finance the ordinary costs of its operations, make payroll,

and satisfy other working capital and operational needs. The Debtor's access to sufficient working capital and liquidity through the use of cash collateral is vital to the preservation and maintenance of the value of the Debtor's businesses, the Stores and the bankruptcy estate in general (the "Estate").

69.    CBT has informed the Debtor that the Debtor may not use any Cash Collateral after the filing of this case until an order authorizing the use of such Cash Collateral is entered. Consequently, without access to use of cash collateral, the Debtor and its Estate would suffer immediate and irreparable harm.

70.    I believe that use of the Cash Collateral in accordance with the Budget and the terms of the interim and final orders entered in connection with the Cash Collateral Motion will provide the Debtor with sufficient funds to maintain operations.

71.    In addition, the terms of the usage of Cash Collateral are the result of intensive, arms-length negotiations between the Debtor and CBT, together with their respective experienced and counsel. I also believe that the terms of the proposed Cash Collateral usage are fair, reasonable, and adequate under all of the circumstances present.

**DEBTOR'S EMERGENCY MOTION FOR ORDER AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION TAXES (the "Tax Motion")**

72.    In the ordinary course of its business, the Debtor collects, withholds and incurs taxes that include sales and use, business and regulatory fees, and other taxes and fees. The Debtor is required to remit the sales and use taxes collected in connection with the sale of goods at its stores to the applicable taxing authorities a periodic basis, usually monthly in arrears for the prior month. Many governmental authorities where the Debtor operates its business require that the Debtor obtain a business license and pay corresponding occupational fees and/or fees associated with the filing of an annual report with such jurisdictions. Taxing authorities also impose custom duties for the importation of goods. The requirement for a company to obtain a business license varies according to the tax law of the jurisdictions, and depends on many factors, including gross receipts.

73.     As the Taxes generally are paid in arrears, the Debtor holds the Taxes for a period of time before remitting them to the appropriate Taxing Authorities. As such, some of the Taxing Authorities were not paid for all prepetition Taxes prior to the Petition Date. For example, the Debtor has paid substantially all of its sales taxes relating to sale on or before June 15, 2018. However, there are payments that must be made for the period June 16, 2018 through the Petition Date.  These payments are due on (x) July 24, 2018 (in the case of taxes due on sales from June 16 to June 30, 2018) and on August 24, 2018 (in the case of taxes due on sales from July 1, 2018 through the Petition Date).[4]

74.     Timely payment of the Taxes in the ordinary course of business is necessary to allow the Debtor to continue to operations during the bankruptcy case and to avoid the imposition of unnecessary interest or penalties. If the Debtor fails to pay Taxes, the Taking Authorities may take actions that could impact the Debtor's ability to operate without interruption. The Debtor also may incur, and would be obligated to pay, increased interest and significant penalties if the Estate does not timely satisfy its ongoing tax obligations for the prepetition period or thereafter.

75.     The Budget referred to above already includes all anticipated Taxes, arising both before and after the Petition Date, which will become due and payable.  Consequently, payment of the Taxes will not render the estate administratively insolvent.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on July 13, 2018 in Los Angeles, California.

/s/  Randall C. Sultan
Randall C. Sultan

---

[4] Taxes on sales made post-petition during July will also be due on August 24, 2018.