**THOMPSON COBURN LLP**
**RICHARD G. REINIS , CSB 45811**
rreinis@thompsoncoburn.com
**JEFFREY N. BROWN, CSB 105520**
jbrown@thompsoncoburn.com
**JULIAN BREW, CSB 150615**
jbrew@thompsoncoburn.com
**2029 Century Park East, 19th Floor**
**Los Angeles, California 90067**
**Tel: 310.282.2500 / Fax: 310.282.2501**

Attorneys for Plaintiff SULTAN FINANCIAL CORPORATION

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 2:18-bk-18021-ER |
| SULTAN FINANCIAL CORPORATION, a California corporation, | Chapter 11 |
| | Adv No. _____ |
| Debtors. | **COMPLAINT; DEMAND FOR TRIAL BY JURY** |
| SULTAN FINANCIAL CORPORATION, a California corporation, | |
| Plaintiff, | |
| vs. | |
| AARON'S, INC., a Georgia corporation, | |
| Defendant. | |

Plaintiff Sultan Financial Corporation ("Sultan") alleges:

## Introduction

1.     This is an adversary proceeding brought in the above-captioned bankruptcy cases pursuant to Part VII of the Bankruptcy Rules seeking to recover

6780772

COMPLAINT

damages under California common law.  Sultan consents to entry of final orders or judgment by the Bankruptcy Court.

### Parties

2. Plaintiff Sultan is a corporation doing business in the State of California.  Sultan is the largest California franchisee of Aaron's, Inc. ("Aaron's"), a rent-to-own retailer and franchisor.  Sultan is headquartered in Los Angeles.  Sultan, founded by Randall and Patricia Sultan, owns and operates 16 locations in California, employing 125 associates, and has operated continuously since 1997.

3. Defendant Aaron's, Inc. ("Aaron's) is a Georgia corporation doing business in the State of California.  There are approximately 1,720 Aaron's stores in the U.S. and Canada, including both franchised and company owned and operated stores.

### Jurisdiction and Venue

4. This Court has jurisdiction over this proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157.

5. This Court has venue over this proceeding under 11 U.S.C. §§ 1408 and 1409.

### Facts Common to All Counts

6. At the peak of Sultan's business as an Aaron's franchisee, Sultan and Aaron's entered into the following 26 franchise agreements:

    a. Franchise agreement #112 dated 6/27/07 for store located at 4127 Ming Ave., Bakersfield, CA 93309.

    b. Franchise agreement #179 dated 3/8/09 for store located at 1080 W. Avenue K, Lancaster, CA 93534.

    c. Franchise agreement #197 dated 6/14/09 for store located at 3820 W. Shaw, Fresno, CA 93711.

    d. Franchise agreement #206 dated 7/27/09 for store located at 3306 South Mooney Blvd., Visalia, CA 93277.

  e. Franchise agreement #239 dated 3/6/10 for store located at 12180 Hesperia Rd., Victorville, CA 92395.

  f. Franchise agreement #261 dated 8/14/10 for store located at 4832 E. Kings Canyon Rd., Fresno, CA 93727.

  g. Franchise agreement #286 dated 9/7/11 for store located at 6025 Niles Street, Bakersfield, CA 93306.

  h. Franchise agreement #351 dated 12/18/02 and renewed 12/18/12 for store located at 1125 Olive Dr., Bakersfield, CA 93308.

  i. Franchise agreement #411 dated 10/7/03 and renewed 1017/13 for store located at 780 Shaw Ave., Clovis, CA 93612. (Closed)

  j. Franchise agreement #462 dated 1/16/04 and renewed 1/16/14 for store located at 2042 E. Palmdale Blvd., Palmdale, CA 93550.

  k. Franchise agreement #503 dated 5/12/04 and renewed 5/12/14 for store located at 411 W. Lacey Blvd., Hanford, CA 93230.

  l. Franchise agreement #504 dated 5/5/04 and renewed 5/5/14 for store located at 1307 E. Main St., Ste. A, Barstow, CA 92311.

  m. Franchise agreement #945 dated 1/30/09 for store located at 260 W. Olive Ave., Ste. A, Porterville, CA 93257.

  n. Franchise agreement #1022 dated 8/7/09 for store located at 2160 E. Pacheco Blvd., Los Banos, CA.

  o. Franchise agreement #1065 dated 214/1 0 for store located at 5750 Van Buren Blvd., Riverside, CA 92503. (Closed)

  p. Franchise agreement #1128 dated 8/6/10 for store located at 2660 Whitson St., Selma, CA 93662. (Closed)

  q. Franchise agreement #1130 dated 8/23/10 for store located at 1614 N. Blackstone Ave., Fresno, CA 93703.

  r. Franchise agreement #1131 dated 8/23/10 for store located at 2560 N. Perris Blvd., Perris, CA 92571.

    s. Franchise agreement #1179 dated 11/30/10 for store located at 1825 Indian Hill Blvd., Pomona, CA 91767.  (Closed)

    t. Franchise agreement #1201 dated 3/1/11 for store located at 363 E. 10th St., Gilroy, CA 95020.  (Closed)

    u. Franchise agreement #1238 dated 10/25/11 for store located at 1007 Cecil Ave., Delano, CA 93215.  (Closed)

    v. Franchise agreement #1239 dated 1/30/09 for store located at 1764 S. Broadway, Santa Maria, CA 93456.  (Closed)

    w. Franchise agreement #1289 dated 9/20/12 for store located at 190 E. Cross Ave. #190, Tulare, CA 93274.  (Closed)

    x. Franchise agreement #1309 dated 1/16/13 for store located at 15385 Main St., Hesperia, CA 92345.  (Closed)

    y. Franchise agreement #1351 dated 3/18/14 for store located at 2116 S. Bristol St., Santa Ana, CA 92704.  (Closed)

    z. Franchise agreement #1352 dated 3/18/14 for store located at 1689 E. Highland Ave., San Bernardino, CA 92404.

As of the date of this Complaint, ten of these locations have been closed as indicated above.  (All the stores operating as of this date do so subject to franchise agreements referred to, collectively, as the "Franchise Agreements.")

  7. The Franchise Agreements describe at Section 6.8 "Franchisor's proprietary point of sale computer software system, . . the computerization of Franchisee's customer and payment records, inventory control and other operational aspects of the Store."  Through this system, Aaron's sets retail prices and rents charged to its franchisees' customers, controls communications with franchisee customers, and controls all aspects of invoicing and payment. This system is hereafter referred to as "the **Program.**"

  8. Sultan is prohibited from reverse engineering the Program, and shall not permit others to copy, modify, adapt, translate, decompile, disassemble or

1. otherwise attempt to create derivative work from this system, and may not alter it or discover its code. Sultan is required to use the Program, but Aaron's disclaims any and all warranties relating to the Program. Aaron's retains the right to alter the Program. (Franchise Agreements, § 6.8(d)). Computer hardware to operate this exclusive system is leased by Aaron's to Sultan. (Franchise Agreements, § 6.10). Sultan may not modify, "compile, reverse compile or disassemble all or any part of the Program." (Franchise Agreements, § 7.13(f)(ii)).

9. After making a presentation to its California franchisees in January 2014, Aaron's installed the new Program for all California franchisees on February 7, 2014. At the meeting, Aaron's made a PowerPoint presentation that represented that the new Program was **"revenue neutral,"** meaning that the new Program would cause no harm to the financial performance of California franchisees. Aaron's assured the California franchisees, including Sultan, that the representations were accurate. Aaron's implemented the new Program to comply with a settlement reached by Aaron's with the California Attorney General (the "**AG**") arising from a complaint filed against Aaron's (<u>not</u> against franchisees), Los Angeles Superior Court Case No. BC559774 (the "**AG Action**").

10. As a result of a settlement of the AG Action, Aaron's was required to offer customers $25 million in restitution, in cash and in credit towards purchases. Aaron's was required to pay the AG $2.4 million for attorneys' fees and costs and in civil penalties.

11. This new Program, however, made changes that were not required by the AG Action or any other California law. The new Program was hastily constructed by Aaron's, without consulting Sultan or its other California franchisees, and in disregard of its own internal report that the new Program would vastly increase early payouts and the amount of money collected on these customer payouts would be significantly less under the new Program than under the system as it existed at the time the Franchise Agreements between Sultan and Aaron's were

executed. To make matters worse, the new Program proved to be poorly designed and negligently implemented. Above all, it was far from "revenue neutral," and it materially eroded profitability contrary to representations of Aaron's. Those representations were breached to the extreme, resulting in millions of dollars in damages to Sultan. The Aaron's settlement with the AG put out a public relations fire caused largely by real and imagined invasions of consumer privacy, but Aaron's used a fire hose that drowned Sultan and other California franchisees. The problems enumerated herein have impacted every California Aaron's, including Aaron's own 45 stores.

12. In early 2016, Sultan advised Aaron's management that early payouts by customers ("**EPOs**"), by which customers elect to terminate their leases before maturity, were mounting at an alarming rate, and Sultan needed data from Aaron's to demonstrate the cause of this alarming change in consumer behavior. As the contracts matured, the conclusion that Aaron's changes to the Program were the cause became inescapable, and corrections proposed by Sultan were ultimately made by Aaron's. However, when Sultan first warned of the dire consequences of the mounting EPOs and other mistakes, including the negative financial results for all of Aaron's California operations, franchisee and franchisor, Aaron's management denied there was a problem, delayed repair, and increased the harm.

13. The frequency of EPOs is significant to the business model of California franchisees. The money collected on an EPO in California is less than collected elsewhere because of provisions of the California Rental-Purchase Act, Civil Code § 1812.620 *et seq.,* also known as the Karnette Rental-Purchase Act. Success to Sultan is dependent upon limiting the rate of EPOs. When that rate increases, profits decline. When customers continue rental arrangements with Sultan, profits increase. The same piece of furniture purchased from Aaron's and leased by Sultan generates more rental income when the rate of EPOs is low. Since February, 2014, with the Aaron's implementation of a new Program, the rate of

1  EPOs has not only not declined, it has dramatically increased, and Sultan's profits
2  have evaporated.  That new Program was not dictated by the settlement with the
3  AG.  It was fabricated incorrectly and unilaterally imposed on Sultan, and Sultan
4  believes Aaron's was aware of the consequences at the time of implementation.
5  Notwithstanding that Aaron's knew the new Program would harm Sultan and other
6  California franchisees, Aaron's represented that the change would be "revenue
7  neutral."  The adverse impact on profits for Sultan is of less consequence to
8  Aaron's.  Royalties are based on gross revenues.

9      14.    On July 20, 2016, the Parties participated in a formal mediation of
10  Sultan's claims in compliance with Section 11.1(b) of each of the Franchise
11  Agreements.  The mediation resulted in a Settlement Agreement ("Settlement
12  Agreement") dated as of October 19, 2016, which will be provided to the Court
13  upon request.  Incident to the Settlement Agreement, Sultan issued to Aaron's a
14  Promissory Note in the amount of Three Million, Six Hundred Sixty-Four
15  Thousand, One Hundred Eighteen Dollars and Seventy-Eight Cents ($3,664,118.78)
16  dated August 1, 2016 ("**Note**").  By this Settlement Agreement, Sultan released
17  claims arising from enumerated disputes that pre-dated the settlement.  The
18  Settlement Agreement also provides, at Section 7, that California law applies to any
19  disputes among the parties.

20      15.    As is of significance in this matter, the Settlement Agreement provides,
21  at Section 2.4: **"The Parties agree to avoid ongoing disputes of a like nature to**
22  **the Disputes by consulting <u>in good faith</u> concerning the operations of the**
23  **business of the Parties, and the Program as defined in Section 7.13(g) of the**
24  **Franchise Agreements, and its implementation, and amendments, corrections,**
25  **or additions thereto, proposed by Sultan or others, and as otherwise may**
26  **improve profitability of California franchisees."** (Emphasis added.)

27      16.    In December 2016 after much study of the Program, and pursuant to
28  Section 2.4 of the Settlement Agreement, Sultan began proposing various changes

and modifications to generate profits and reduce the rising number of EPO's and otherwise improve Sultan's performance. Sultan's proposal was consistent with applicable law, including the Karnette Rental-Purchase Act. Aaron's rejected these changes or did not respond to these requests or, after initially representing that Aaron's was investigating the proposals and was taking the matter seriously, never got back to Sultan. Nothing happened.

17. In September 2017, Sultan proposed a specific modification to the Program that would materially increase revenue and enhance profitability. On October 20, 2017, Aaron's confirmed that the proposed correction of the Program would likely achieve the desired result and not violate applicable law.

18. All along Sultan has advised Aaron's that immediate corrections to the Program were required as the financial viability of Sultan was compromised by the existing Program, and even if immediately corrected, the benefits of a corrected Program would not take effect for at least 18 months. Aaron's was notified in writing and verbally by Sultan of the urgency of these requested corrections on numerous occasions. With respect to the requested changes of September 2017, Aaron's response on October 20 and November 6, 2017 was that a correction would be made as soon as it could be scheduled and estimated that the implementation date would take approximately four months. Nothing happened.

19. On or about November 13 and 30 and on December 4 and 12, 2017, Sultan, once again advised Aaron's that Sultan's continued existence was jeopardized for want of the requested changes. Aaron's responded on November 15 that it had assigned the task to a third party vendor, which would undertake the work shortly after it received a requested "statement of work" from the third party vendor on December 8. Nothing happened. When Sultan again assured Aaron's that the fiscal well-being of Sultan hung in the balance and inquired as to status, it was told by executives that Aaron's was working on scheduling a fix and that Aaron's had determined that it would be faster and more efficient for Aaron's to assign its own

team to complete the work and such work would commence soon.  But nothing happened.  This process of a good faith request for Program correction and lack of response or a misleading response by Aaron's continues to this day, with no end in sight.  The Aaron's response does not constitute good faith under the terms of the Settlement Agreement, nor under California law.

20. As a direct and proximate result of the breach by Aaron's, Sultan continues to experience excessive early payouts and its customer base, revenues, and agreement values continue to decline.  Since the contracts comprise the primary collateral securing Sultan's obligations to California Bank & Trust ("CBT"), the bank has seen its collateral base, those same contracts, shrink, causing the company's relationship with CBT to deteriorate.  Sultan advised senior executives of CBT of the progress of discussions with Aaron's about the changes to the Program.  As the inaction of Aaron's continued, Sultan met with Douglas Lindsey, Kelly Wall and Scott Harvey of Aaron's on March 29, 2018 in Atlanta, and was told that Aaron's could not commit to a date wherein the new Program would be installed.  Aaron's executives replied that the company would, however, agree to send an Aaron's representative to meet with CBT and Sultan in an effort to help Sultan survive.

21. To address CBT's concern, Aaron's executives suggested to Sultan that Aaron's, the franchisor, might assume some portion of the Sultan debt to CBT.  Aaron's Kelly Wall and Sultan representatives met on April 16, 2018 with CBT officials Scott Monson, Bruce Hendricks, and Grant Hill (of the special assets section of the bank).  At that meeting, representatives of the bank stated that to a significant extent the financial difficulties suffered by Sultan were not of Sultan's making, but rather directly attributable to Aaron's refusal to implement the Program corrections above mentioned.  Kelly Wall of Aaron's advised CBT executives that Aaron's did not have a specific date scheduled to implement the Program changes, but that it tentatively intended to do so sometime in 2019.  This was a total surprise

to Sultan, which had theretofore been told and led to believe by Aaron's that it was committed to making these changes and would do so within an acceptable timeframe, but certainly sometime in 2018 at the very latest. In addition, by making this statement, Mr. Wall of Aaron's gave CBT even more reason for concern over its credit and position with Sultan and the value of its collateral since Aaron's had committed to making these necessary changes in a timely fashion. Thus, far from helping Sultan, Aaron's executives had put Sultan in an even more tenuous position with CBT.

22. Mr. Wall, while meeting with executives of CBT and Sultan and in private telephone conversations thereafter, discussed the idea of Aaron's assuming some portion of the Sultan debt, perhaps with a *pari passu* arrangement that would allow these creditors to stand on a more equal footing. Sultan asked to be involved in any discussions with the bank, but Mr. Wall asked that Sultan not participate, but promised to report what occurred. In a subsequent communication from Mr. Wall to Sultan, Mr. Wall advised that Aaron's had decided that it was not willing to provide credit assistance to Sultan by assuming some part of Sultan's existing obligations under its CBT line of credit or in any other manner. By initially representing to CBT that it would consider taking on part of the Sultan obligation on the CBT line of credit, and then later refusing to do it, Aaron's executives have put Sultan in an even more tenuous position with CBT. In short, the interactions among Aaron's executives and CBT and Sultan only made matters worse.

23. CBT executives have advised Sultan that the bank's special assets division will require a principal reduction of approximately $6,000,000, commencing in June 2018. A reduction of this magnitude is simply not feasible for Sultan. Much of the debt now carried by Sultan was incurred to purchase ten Aaron's stores in 2014, the purchase price of which was predicated on a formula established by Aaron's. That formula was altered by Aaron's after the purchase to reduce valuations of all ten stores. Further, Sultan has had to close ten stores over

the last 18 months in order to cut expenses and losses arising from the accelerated payouts of its contracts, which is a direct result of the failure of Aaron's to perform its Settlement Agreement obligations to revise the Program in good faith. This has further diminished CBT's collateral, *i.e.*, the value of outstanding contracts.

24. These workout demands by CBT are directly caused by Aaron's long delays in implementation of the necessary corrections to the Program that resulted in the shrinkage of CBT's collateral. The actions of Aaron's are in bad faith and in violation of the Settlement Agreement. To exacerbate the problem, Sultan's auditors have informed it that their audit will include a "going concern" statement, which will be received very poorly by CBT. This is a direct and proximate result of Aaron's decision not to start making the corrections in the Program until an unknown date in 2019 and even then there has been no firm commitment. By postponing the implementation of the correction, Aaron's is effectively strangling Sultan and ensuring its demise.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (Against All Defendants)

25. Plaintiff realleges and incorporates herein by reference each and every allegation set forth hereinabove in Paragraphs 1 through 24, inclusive.

26. Plaintiff has performed its obligations under the Settlement Agreement except for those matters excused by Defendant's material breaches.

27. As a result of Aaron's misconduct, Sultan has sustained damages in an amount to be determined at trial, but known to be in excess of $20,000,000.

## SECOND CLAIM FOR RELIEF

### Violation of the California Unfair Business Practices Act,

### Cal. Bus. & Prof. Code § 17200 *et seq.*

### (Against All Defendants)

28. Plaintiff realleges and incorporates herein by reference each and every allegation set forth hereinabove in Paragraphs 1 through 24, inclusive.

29. By the acts alleged above, Defendant has committed business acts and practices that are "unlawful" and "unfair" in violation of the Unfair Competition Law, California Business & Professions Code Section 17200 *et seq.*

30. Defendant's acts entitle Plaintiff to disgorgement of Defendant's profits derived from its past unlawful conduct to the full extent provided for by Section 17200 *et seq.*

31. Plaintiff has no adequate remedy at law for the foregoing wrongful conduct. Plaintiff has been, and absent injunctive relief will continue to be, irreparably harmed by Defendant's actions.

## THIRD CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against All Defendants)

32. Plaintiff realleges and incorporates herein by reference each and every allegation set forth hereinabove in Paragraphs 1 through 24, inclusive.

33. Plaintiff has performed its obligations under the Settlement Agreement except for those matters excused by Defendant's material breaches.

34. Defendant engaged in conduct, separate and apart from the performance of obligations under the contracts, without good faith and for the purpose of depriving the Plaintiff of rights and benefits under the contracts; and such conduct caused Plaintiff to suffer damage.

## FOURTH CLAIM FOR RELIEF

### Intentional Fraud

### (Against All Defendants)

35.  Plaintiff realleges and incorporates herein by reference each and every allegation set forth hereinabove in Paragraphs 1 through 24, inclusive.

36.  Plaintiff alleges on information and belief that Aaron's has pursued a plan for the ultimate purpose of purchasing the assets of Sultan whereby Sultan would be forced to sell at "fire sale" as the direct and proximate cause of Aaron's continued rejection of programming changes, false representations that the new Program was "revenue neutral," the Program "fix" was imminent, and that Aaron's did not intend to harm Sultan by its secret conversations with Sultan's lender.

37.  As previously alleged, Aaron's executives knew that the Program produced consumer contracts in such a manner as to reduce profits for Sultan to such a degree as to cause Sultan to suffer financially to the extent that it would be forced to sell existing stores cheaply, and because of the restrictions on assignment of franchise agreements, Aaron's executives knew that the only possible buyer for such stores would be Aaron's itself.  After Sultan acquired ten stores in 2014 at the purchase price established by Aaron's own matrix, Aaron's changed the matrix which caused the value of Sultan's stores to be greatly diminished.  Aaron's would, thereby, be able to acquire the assets of Sultan's at a vastly reduced price and add Sultan's stores to the more than forty California stores operated by the franchisor. Moreover, to compound the wrong, Aaron's would not only be able to acquire the assets of Sultan at a vastly reduced price, but with the actual knowledge that Sultan had handed Aaron's a solution to the business model in California that complied with the law it could incorporate these changes on its own timeframe and subsequently greatly increase revenue and profitability.  Thus Aaron's would reap an enormous windfall once it decided to implement these changes, denying all

benefits thereof to, and at the expense of, Sultan, exclusively and in bad faith reserving them to itself.

38. Aaron's intended to deceive Sultan and induce it to continue in business with the false hope that it would act in good faith and help would be forthcoming. Aaron's knew these promises were false when made by Aaron's executives, with the intent to deceive and harm Sultan.

39. Sultan did not know of and could not have reasonably known of the fraud committed by Aaron's. Sultan reasonably relied on such false promises to its detriment. The reliance was reasonable based on the long-standing relationship of the parties, and justifiable.

40. The full extent of damages is not presently known, but Sultan alleges that the value of the company has declined since it presented Aaron's with a request for changes to the Program in December 2016, by not less than $20,000,000.

## FIFTH CLAIM FOR RELIEF

### Promissory Estoppel

### (Against All Defendants)

41. Plaintiff realleges and incorporates herein by reference each and every allegation set forth hereinabove in Paragraphs 1 through 24, inclusive.

42. Aaron's representations identified more fully above confirming that Aaron's would promptly make the changes to the Program constitute an enforceable promise.

43. Sultan relied on Aaron's representations believing that Aaron's actually intended to make the changes to the Program.

44. Sultan's reliance was reasonable, foreseeable, and detrimental.

45. Aaron's representations, and Sultan's reliance on Aaron's representations, were a substantial factor in causing Sultan's harm as set forth above.

46. As a result of Aaron's misconduct, Sultan has sustained damages in an amount of be determined at trial, but known to be in excess of $20,000,000.

## SIXTH CLAIM FOR RELIEF

### Declaratory Relief

### (Against All Defendants)

47. Plaintiff refers to and incorporates herein by reference each and every allegation set forth hereinabove in Paragraphs 1 through 24, inclusive.

48. An actual controversy has arisen and now exists between Plaintiff and Defendant in that Plaintiff contends, and Plaintiff is informed and believes Defendant denies, that Defendant has not acted in good faith concerning operation of the business and the Program. Plaintiff, in agreeing to the terms of the Settlement Agreement, relied on Defendant's performance of its obligations, including section 2.4 Paragraph 14 hereof), and that Plaintiff would not have agreed to the limited royalty relief nor obligate itself to the terms of the Note but for the promises of Defendant as set forth in the Section 2.4.

49. As a result of the acts and omissions alleged herein, until such time as Defendant has complied with Section 2.4 of the Settlement Agreement, and continuing for a period of eighteen (18) months thereafter, Plaintiff shall be excused from payment (1) of royalties under the Franchise Agreements; and (2) any amounts allegedly due under the Note.

50. Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and Defendant with respect to the above-described matters.

51. Such a declaration is necessary and appropriate at this time in order that Plaintiff and Defendant may ascertain their respective rights and duties with respect to the Settlement Agreement, the Franchise Agreements, and the Note.

## PRAYER

**WHEREFORE,** Plaintiff prays for judgment as follows:

1. On the First, Third, Fourth, and Fifth Claims for Relief, for general damages according to proof, together with interest thereon as provided by law;

2. On the Second Claim for Relief, a disgorgement of Defendant's profits derived from their past unlawful conduct to the full extent provided for by Section 17200 *et seq.*;

3. On the Second Claim for Relief, for the issuance by the Court of a preliminary injunction restraining and enjoining Defendant, together with its agents, officers, servants, employees, associates, representatives, employers, independent contractors, predecessors, successors and associated entities, as well as all persons acting in concert or participating with them from engaging in, committing or performing, whether directly or indirectly, any or all of the following acts: violating Section 2.4 of the Settlement Agreement, contacting Plaintiff's CBT account representatives without the express written permission of Plaintiff, and failing to generate contracts consistent with California law and the parties' prior agreement;

4. On the Sixth Claim for Relief, for a declaration of the rights and duties of Plaintiff and Defendant with regard to the matters herein described and, specifically, a declaration that Plaintiff is excused from paying to Defendant (1) royalties under the Franchise Agreements; and (2) any amounts allegedly due under the Note; until such time as Defendant is in compliance with Section 2.4 of the Settlement Agreement, and for a period of at least eighteen (18) months thereafter.

5. For the immediate issuance of a temporary restraining order prohibiting the above-mentioned acts;

6. For the issuance of a permanent injunction prohibiting the above-mentioned acts;

7. On the Fourth Claim for Relief, for an award of punitive and exemplary damages in an amount to be determined by the trier of fact;

8. On the First Claim for Relief, for reasonable attorneys' fees;

9. For the costs of suit incurred herein; and

10. For such other, further or different as the Court deems just and proper.

DATED: July 16, 2018           **THOMPSON COBURN LLP**

By: _____*/s/ Jeffrey N. Brown*_____
   **RICHARD G. REINIS**
   **JEFFREY N. BROWN**
   **JULIAN BREW**
   Attorneys for Plaintiff SULTAN FINANCIAL CORPORATION

## DEMAND FOR TRIAL BY JURY

Plaintiff Sultan demands a trial by jury in this matter. Plaintiff Sultan consents to a jury trial conducted by the bankruptcy court.

DATED: July 16, 2018        **THOMPSON COBURN LLP**

By:    */s/ Jeffrey N. Brown*
**RICHARD G. REINIS**
**JEFFREY N. BROWN**
**JULIAN BREW**
Attorneys for Plaintiff SULTAN FINANCIAL CORPORATION